**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| MELANIE PLACE, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> FINANCE OF AMERICA COMPANIES INC., <br><br> Defendant. | **CLASS ACTION COMPLAINT** <br><br> Case No. <br><br> Judge: <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Melanie Place ("Plaintiff"), on behalf of herself and all others similarly situated, through undersigned counsel, brings this class action against Finance of America Companies Inc. ("Defendant" or "Finance of America") and alleges, upon personal knowledge as to her own actions and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. On or about March 20, 2026, the ransomware group WorldLeaks publicly claimed responsibility for a cyberattack against Finance of America. WorldLeaks infiltrated Finance of America's systems and exfiltrated sensitive information of potentially several thousand individuals (the "Data Breach").[1]

2. Defendant's failure to safeguard, monitor, maintain, and protect highly sensitive personal and financial information included, upon information and good faith belief, Social

---

[1] https://www.ransomware.live/id/RmluYW5jZSBvZiBBbWVyaWNhIENvbXBhbmllcyBJbmMuQHdvcmxkbGVha3M=

Security Numbers, addresses, names, dates of birth, driver's license information, mortgage information, and financial account information, (collectively, "Personally Identifiable Information" or "PII").

3. Entities like Finance of America that collect and maintain sensitive PII of their customers owe a duty of care to the individuals to whom that information pertains. This duty arises because it is foreseeable that the exposure of PII to unauthorized persons, especially hackers with nefarious intentions, will result in harm to the affected individuals.

4. As a direct and proximate result of Finance of America's deficient security practices, Plaintiff's and Class Members' PII is now in the hands of unauthorized parties.

5. Plaintiff and Class Members now face a substantial and imminent risk of identity theft, financial fraud, unauthorized account access, and other personal, social, and financial harms that may persist for life.

6. Plaintiff and Class Members therefore suffer, and continue to face, ascertainable losses, including heightened risk of identity theft, out-of-pocket mitigation costs, lost time, diminished value of their PII, impending risk of fraud, identity theft, and dissemination of their data on the dark web.

7. Plaintiff and Class Members have already suffered concrete injuries in fact, including loss of data value and time and opportunity costs, and must now devote additional time and money to monitor accounts, secure credit files, and otherwise protect themselves.

8. On behalf of the Class, Plaintiff asserts claims for (i) negligence; (ii) breach of implied contract; (iii) unjust enrichment; and (iv) breach of fiduciary duty.

**Parties**

9.      Plaintiff Melanie Place is, and at all times relevant hereto was, a citizen of the State of West Virginia, residing in Martinsburg, West Virginia 25403.

10.     Defendant Finance of America Companies Inc. is a publicly traded financial services holding company incorporated under the laws of Delaware and headquartered at 5830 Granite Parkway, Suite 400, Plano, Texas 75024. Through its operating subsidiaries, Finance of America provides home equity-based financing solutions, including reverse mortgage loans, loan securitization, and asset management services, and trades on the New York Stock Exchange under the ticker symbol "FOA."

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the putative class is a citizen of a different state than Defendant, there are more than 100 putative class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Plano, Texas, within the Eastern District of Texas, and conducts substantial business in this jurisdiction.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant maintains its principal place of business in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**COMMON FACTUAL ALLEGATIONS**

**A.      Defendant Collected, Maintained, and Stored PII.**

14.      Defendant is a financial services holding company headquartered in Plano, Texas, providing home equity-based financing solutions for retirement, including reverse mortgage loans, loan securitization, risk management, servicing oversight, and asset management services throughout the United States.

15.      Plaintiff and Class Members are current and former customers who obtained services from Finance of America.

16.      To obtain financial services, Plaintiff and Class Members were required to provide Finance of America with sensitive PII including their Social Security Numbers and financial information.

17.      Upon information and belief, Finance of America represented that it would maintain that information in strict confidence and employ reasonable safeguards to protect it.

18.      Given the highly sensitive nature of the information it collects, Finance of America is obligated to (a) keep customers' PII confidential; (b) follow industry-standard data-security practices; (c) inform customers of its data-security duties; (d) comply with all applicable federal and state privacy laws; (e) use or disclose the data only for legitimate business or administrative purposes; and (f) provide prompt notice of any unauthorized disclosure.

19.      By obtaining and benefiting from Plaintiff's and Class Members' PII, Finance of America assumed legal and equitable duties to protect that data from unauthorized access or disclosure.

20.      Without the submission of such data, Finance of America could not perform the services it offers.

21.    Plaintiff and Class Members reasonably relied on Finance of America to maintain their PII securely and to disclose it only as authorized. Finance of America ultimately failed to honor these duties.

**B.    Defendant's Data Breach Exposed PII.**

22.    On or about March 20, 2026, the WorldLeaks ransomware group claimed responsibility for a cyberattack that gained access to Finance of America's systems and exfiltrated data belonging to current and former customers.[2]

23.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the PII it was maintaining for Plaintiff and Class Members prior to the cyberattack, causing the exposure of their PII.

24.    The WorldLeaks ransomware group accessed and acquired files in Defendant's systems containing unencrypted PII of Plaintiff and Class Members, including upon information and good faith belief, Social Security Numbers, addresses, names, dates of birth, driver's license information, mortgage information, and financial account information.

25.    Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

26.    Defendant derives a substantial economic benefit from its financial services operations, which rely on thousands of customer relationships through which Defendant requires, collects, and stores Plaintiff and Class Members' PII.

27.    Defendant was well aware that the PII and financial information it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

---

[2] *Id.*

28.    Defendant also knew that a breach of its systems and exposure of the information stored therein including financial information would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

29.    These risks are not merely theoretical; in recent years, numerous high-profile data breaches have occurred at financial institutions and businesses such as Equifax, Capital One, JPMorgan Chase, and countless others in the financial services industry.

30.    PII has considerable value and constitutes an enticing and well-known target to hackers, who can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the dark web that serve as a bustling marketplace for such commerce."[3]

31.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities.

32.    In 2021 alone, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[4]

33.    In 2021, the FTC received approximately 5.7 million consumer reports through the Consumer Sentinel Network, including nearly 1.4 million reports of identity theft—and consumers

---

[3] *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), https://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/
[4] See Inga Goddijn, *Over 22 Billion Records Exposed in 2021*, Security Mag. (Feb. 10, 2022), https://www.securitymagazine.com/articles/97046-over-22-billion-records-exposed-in-2021.

reported losing more than $5.8 billion to fraud, an increase of more than 70 percent over the previous year.[5]

34.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Finance of America's current and former customers especially vulnerable to identity theft, financial fraud, credit fraud, and more.

35.    A complete identity theft kit that includes financial account credentials may be worth hundreds or thousands of dollars on the black market.

36.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as social engineering to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number.

37.    Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' PII to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

38.    For these reasons, the Federal Trade Commission ("FTC") recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert

---

[5] Fed. Trade Comm'n, *New Data Shows FTC Received 2.8 Million Fraud Reports from Consumers in 2021* (Feb. 22, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/02/new-data-shows-ftc-received-28-million-fraud-reports-consumers-2021-0.

on their account, reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[6]

39.    Identity thieves can use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, obtaining a driver's license or official identification card in the victim's name but with the thief's picture, obtaining government benefits, or filing a fraudulent tax return using the victim's information.

40.    Social Security numbers, which were compromised in the Data Breach, are among the worst kind of information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

41.    There may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII is stolen and when it is misused.

42.    Even if stolen PII does not include all account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing.

43.    Based on the value of its customers' PII to cybercriminals, Finance of America certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

**C.    Finance of America's Inadequate Data Security Practices.**

44.    Given that Finance of America stored Plaintiff's and Class Members' PII and knew or should have known of the serious risk and harm caused by a data breach, Finance of America

---

[6] *See* Fed. Trade Comm'n, How to Recover from Identity Theft (last updated Sept. 27, 2024), https://consumer.ftc.gov/consumer-alerts/2024/09/how-recover-identity-theft.

was obligated to implement reasonable measures to prevent and detect cyber-attacks, such as those recommended by the FTC and promoted by data security experts and other agencies.

45. That obligation stems from the foreseeable risk of a data breach given that Finance of America collected, stored, and had access to highly sensitive personal records and data and because other highly publicized data breaches put Finance of America on notice that the personal and sensitive data it stores might be targeted by cybercriminals.

46. Despite the abundance and availability of information regarding cybersecurity best practices and the prevalence of data breaches, Finance of America failed to adopt sufficient data security processes by, without limitation:

> a. Failing to properly implement adequate access controls and monitoring systems;
>
> b. Failing to ensure the proper monitoring and logging of network traffic;
>
> c. Failing to ensure the proper monitoring and logging of file access and modifications;
>
> d. Failing to ensure the proper training of employees as to cybersecurity best practices;
>
> e. Failing to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members;
>
> f. Failure to timely and accurately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed;
>
> g. Knowingly disregarding standard information security principles by allowing inadequate security measures;
>
> h. Failing to provide adequate supervision and oversight of the PII with which it was entrusted.

47. Finance of America further failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data security incidents, to ensure the proper encryption of Plaintiff's and Class Members' PII, and to monitor user behavior and activity to identify possible threats.

48. Time is of the essence when PII is subject to unauthorized access and/or acquisition.

49. The disclosed, accessed, and/or acquired PII of Plaintiff and Class Members is, upon information and good faith belief, already available on the dark web.

50. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals.

51. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the publication of their PII onto the dark web.

52. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, or activity by cybercriminals on computer systems containing sensitive personal information, including upon information and good faith belief, Social Security Numbers, addresses, names, dates of birth, driver's license information, mortgage information, and financial account information.

53. The Data Breach, coupled with WorldLeaks's claim of responsibility, the ongoing need to remediate Finance of America's cybersecurity, and the highly sensitive nature of the affected data, collectively demonstrate that Finance of America failed to implement reasonable measures to prevent cyber-attacks and to safeguard the PII it maintained.

**D.  Finance of America Failed to Comply with FTC Guidelines.**

54. The FTC recognizes that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types

and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[7]

55.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[8]

56.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for business.[9]

57.    Those guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

58.    The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[10]

---

[7] Pamela Jones Harbour, Comm'r, Fed. Trade Comm'n, Remarks at the FTC Exploring Privacy Roundtable (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[8] Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

[9] Fed. Trade Comm'n, *Data Security*, https://www.ftc.gov/business-guidance/privacy-security/data-security.

[10] *Id.*

59.     The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.[11]

60.     According to the FTC, reasonable data security protocols require:

    a.      Encrypting the information stored on computer networks;

    b.      Retaining payment card information only as long as necessary;

    c.      Properly disposing of personal information that is no longer needed or can be disposed of pursuant to relevant state and federal laws;

    d.      Limiting administrative access to business systems;

    e.      Using industry-approved tools;

    f.      Monitoring activity on networks to uncover unapproved activity;

    g.      Verifying that privacy and security features function properly;

    h.      Testing for common vulnerabilities; and

    i.      Updating and patching third-party software.[12]

61.     The FTC cautions businesses that failure to protect PII and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect. The FTC treats the failure to implement reasonable and adequate data security measures like Finance of America failed to do here as an unfair act prohibited by Section 5(a) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

62.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and

---

[11] Cybersecurity & Infrastructure Sec. Agency & Fed. Bureau of Investigation, *#StopRansomware Guide* (Oct. 2023), https://www.cisa.gov/stopransomware/ransomware-guide.
[12] *Id.*

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA.

63.     Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

64.     Finance of America failed to properly implement basic data security practices.

65.     Finance of America's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

66.     Finance of America was at all times fully aware of the obligation to protect the PII of its current and former customers. Finance of America was also aware of the significant repercussions that would result from its failure to do so.

**E.      Cyberattacks and Data Breaches Cause Disruption and Put Victims at an Increased Risk of Fraud and Identity Theft.**

67.     Cyberattacks and data breaches at companies like Finance of America can negatively impact the overall daily lives of individuals affected by the attack.

68.     The United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[13]

69.     Often, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data

---

[13] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 1 (June 2007), https://www.gao.gov/assets/a262904.html.

an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or otherwise harass or track the victim.

70.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

71.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

72.     In addition, thieves may obtain a job using the victim's Social Security Number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in a record under the victim's name.

73.     Moreover, theft of PII is also gravely serious because PII is an extremely valuable property right.[14]

74.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[15]

75.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

---

[14] *See, e.g.*, John T. Soma *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich J.L. & Tech. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets." (citations omitted).
[15] *The GAO Report*, at 29.

76.     Moreover, it is not an easy task to change or cancel a stolen Social Security number as an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse.

77.     Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[16]

78.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[17]

79.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are now at an increased risk of fraud and identity theft.

80.     Plaintiff and Class Members must vigilantly monitor their financial and other personal accounts for many years to come.

**F.  Plaintiff's and Class Members' Damages.**

81.     Upon information and good faith belief, Plaintiff and Class Members have been damaged by the compromise of their PII in the Data Breach.

---

[16] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[17] Tim Hudsone, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, Network World (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

82.     Plaintiff's and Class Members' PII was compromised in the Data Breach and is now in the hands of cybercriminals who accessed the data Finance of America held within its systems. The PII exposed, included upon information and good faith belief, the Social Security Numbers, addresses, names, dates of birth, driver's license information, financial account information, and other PII belonging to Finance of America's current and former customers.

83.     As a direct and proximate result of Finance of America's conduct, Plaintiff and Class Members have been placed at an imminent and continuing increased risk of harm from fraud and identity theft.

84.     As a direct and proximate result of Finance of America's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach, valuable time Plaintiff and Class Members otherwise would have spent on other activities, including but not limited to work.

85.     Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

86.     Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

87.     Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

88.     Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach.

16

89.     Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members who are current or former customers of Finance of America or who otherwise submitted their data to Finance of America, overpaid for services like employee benefit funds and insurance that was intended to be accompanied by adequate data security that complied with industry standards.

90.     Part of the bargain Plaintiff and Class Members had with Finance of America was intended to be used by Finance of America to fund adequate data security practices to safeguard Plaintiff's and Class Members' PII.

91.     As demonstrated by the Data Breach, Finance of America failed to fund and provide adequate data security practices. Thus, Plaintiff and the Class Members who are current or former customers of Finance of America did not get what they paid for and agreed to.

92.     Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Finance of America, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online or otherwise to unauthorized third parties.

93.     Further, as a result of Finance of America's conduct, Plaintiff and Class Members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

94.     As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have suffered emotional distress and loss of privacy and are at an increased risk of future harm.

**REPRESENTATIVE PLAINTIFF'S EXPERIENCE**

95.     Plaintiff Melanie Place is a former customer of Defendant Finance of America, having first obtained its financial services in or around June 2017.

96.     As a condition of obtaining financial services from Defendant, Plaintiff was required to provide her PII, including her full name, date of birth, Social Security Number, Driver's License or State ID Number, Financial Account Information, and mortgage information to Defendant.

97.     Defendant maintained Plaintiff's PII in its systems at the time of the Data Breach.

98.     On or about March 20, 2026, Defendant was subject to the Data Breach. On information and belief, Plaintiff's PII including her Social Security Number, address, name, date of birth, driver's license information, and financial account information were accessed or acquired as a result of the Data Breach.

99.     Plaintiff is very careful about sharing her sensitive PII. She stores any documents containing PII in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

100.     As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

101.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

102.    Plaintiff additionally suffered actual injury in the form of her PII being disseminated, on information and belief, on the dark web as a result of the Data Breach.

103.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

104.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

105.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

106.    Plaintiff brings this action pursuant to Fed. R. Civ. Pr. 23 in the United States District Court for the Eastern District of Texas, on behalf of herself and all others similarly situated.

107.    The Class that Plaintiff seeks to represent (the "Class") is defined as follows:

> All individuals residing in the United States whose PII was compromised
> by Finance of America's Data Breach.

108. The following people are excluded from the Class: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and its current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

109. Numerosity: The exact number of members of the Class is unknown but, upon information and belief, it is estimated to number in the tens or hundreds of thousands at this time, and individual joinder in this case is impracticable. Members of the Class can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

110. Typicality: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff, and the members of the Class, sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

111. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to

20

vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with, or are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

112.    Commonality and Predominance: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a.    Whether Defendant violated the laws asserted herein, including statutory privacy laws;

b.    Whether Defendant had a duty to use reasonable care to safeguard Plaintiff's and Class Members' PII;

c.    Whether Defendant breached the duty to use reasonable care to safeguard Plaintiff's and Class Members' PII;

d.    Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing PII;

e.    Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

f.    Whether Finance of America's conduct was likely to deceive the public;

g.    Whether Finance of America's conduct, practices, statements, and representations about the Data Breach of the PII violated applicable federal and state laws;

h.    Whether Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

i.    What the proper measure of damages is; and

j.    Whether Plaintiff and members of the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

113.    Superiority: This cause is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual

members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Finance of America's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Finance of America's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

114.    A class action is superior to individual litigation because:

a.    The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Finance of America's conduct economically feasible in the absence of the class action procedural device;

b.    Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c.    The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

115.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Finance of America failed to timely and adequately notify the public of the Data Breach;

b.    Whether Finance of America owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    c.    Whether Finance of America's security measures to protect its data systems were reasonable; and

    d.    Whether Finance of America failed to take commercially reasonable steps to safeguard PII in its possession.

116. Finally, all members of the proposed Class are readily ascertainable. Finance of America has access to Class Members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### NEGLIGENCE
#### *(On Behalf of Plaintiff & the Class)*

117. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

118. Finance of America required its customers, including Plaintiff and Class Members, to submit their PII to obtain financial services from Finance of America.

119. By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Finance of America owed a duty of care to use reasonable means to secure and safeguard its computer system, including Plaintiff's and Class Members' PII, to prevent disclosure of the information, and to safeguard the information from theft. Finance of America's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

120. Finance of America owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, the personnel responsible for them, and its information technology partners adequately protected the PII.

121.    Plaintiff and the Class are a well-defined, foreseeable group of customers that Finance of America was aware, or should have been aware, could be injured by inadequate data security measures.

122.    A large repository of highly valuable personal information is a foreseeable target for cybercriminals looking to steal and profit from that PII. Finance of America knew or should have known that, given its repository of a host of PII for thousands of customers, it posed a significant risk of being targeted for a data breach. Thus, Finance of America had a duty to reasonably safeguard Plaintiff's and Class Members' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act reasonably and safeguard the PII.

123.    PII is highly valuable, and Finance of America knew, or should have known, the risk in obtaining and storing the PII of Plaintiff and Class Members. Thus, Finance of America knew, or should have known, the importance of exercising reasonable care in handling the PII entrusted to it.

124.    Finance of America's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Finance of America and its customers. Finance of America was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from the Data Breach.

125.    In addition, Finance of America has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

126.    Finance of America's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Finance of America is bound by industry standards to protect confidential PII.

127.    Finance of America breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Finance of America include, but are not limited to, the following:

   a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

   b.    Failing to adequately monitor the security of its networks and systems;

   c.    Failing to have in place mitigation policies and procedures;

   d.    Allowing unauthorized access to Plaintiff's and Class Members' PII;

   e.    Failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised; and

   f.    Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

128.    Finance of America breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class Members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite the known risk of data breaches, and allowing unauthorized access to Plaintiff's and Class Members' PII.

129.    The failure of Finance of America to comply with industry standards and federal regulations evidences Finance of America's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII.

130.    But for Finance of America's wrongful and negligent breach of its duties to Plaintiff and Class Members, their PII would not have been compromised, stolen, and viewed by

unauthorized persons. Finance of America's negligence was a direct and legal cause of the theft of the PII of Plaintiff and Class Members and all resulting damages.

131.    It was foreseeable that Finance of America's failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

132.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would result in one or more types of injuries to Plaintiff and Class Members.

133.    As a result of this misconduct by Finance of America, the PII of Plaintiff and Class Members was compromised, placing them at a greater risk of identity theft and of their PII being disclosed to third parties without the consent of Plaintiff and the Class.

134.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

135.    Plaintiff and Class Members are also entitled to injunctive relief requiring Finance of America to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## SECOND CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
### *(On Behalf of Plaintiff & the Class)*

136.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

137.    Defendant Finance of America required Plaintiff and Class Members to provide and entrust their PII as a condition of obtaining financial services from Defendant.

138.    Defendant Finance of America promised to comply with legal and industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

139.    Implicit in the agreement between Defendant Finance of America and Plaintiff and Class Members was the obligation that both parties would maintain the PII confidentially and securely.

140.    Defendant Finance of America had implied duties of good faith to ensure that the PII of Plaintiff and Class Members in their possession was used only as authorized.

141.    Finance of America had implied duties to protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses.

142.    Additionally, Finance of America implicitly promised to retain this PII only under conditions that kept such information secure and confidential.

143.    Through their course of conduct, Finance of America, Plaintiff and Class Members entered into implied contracts for Finance of America to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII.

144.    Finance of America solicited and invited Plaintiff and Class Members to provide their PII as part of Finance of America's regular business practices. Plaintiff and Class Members accepted Finance of America's offers and provided their PII to Finance of America.

145.    Plaintiff and Class Members fully performed their obligations under the implied contract with Finance of America. Finance of America did not. Plaintiff and Class Members would not have provided their confidential PII to Finance of America in the absence of their implied contracts with Finance of America and would have instead retained the opportunity to control their PII for uses other than obtaining benefits and services from Finance of America.

146.    Finance of America breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect Plaintiff's and Class Members' PII, including Social Security Numbers, addresses, name, dates of birth, driver's license information, and financial account information; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contracts between Plaintiff, Class Members, and Finance of America.

147.    Finance of America's failures to meet these promises constitute breaches of the implied contracts.

148.    Finance of America's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their PII in exchange for financial services.

149.    As a direct and proximate result of Finance of America's above-described breach of implied contract, Plaintiff and Class Members have suffered and will continue to suffer (a) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the possibility of an illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non-economic harm.

150.    As a direct and proximate result of Finance of America's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### *(On Behalf of Plaintiff & the Class)*

151.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

152.    This claim is pleaded in the alternative to Plaintiff's breach of implied contract claim.

153.    Plaintiff and Class Members conferred a monetary benefit on Defendant Finance of America through their purchase of Defendant's services. A portion of the proceeds of this benefit was intended to have been used by Defendant for data security measures to secure Plaintiff and Class Members' PII. Plaintiff and Class Members further conferred a benefit on Defendant by entrusting their PII to Defendant from which Defendant derived profits.

154.    Defendant Finance of America enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

155.    Under the principles of equity and good conscience, Defendant Finance of America should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

156. Defendant Finance of America acquired the monetary benefit and PII through inequitable means in that Defendant failed to disclose the inadequate security practices, as described herein, and failed to maintain adequate data security.

157. If Plaintiff and Class Members knew that Defendant Finance of America had not secured their PII, they would not have agreed to give their money—or disclosed their data— to Defendant.

158. Plaintiff and Class Members have no adequate remedy at law.

159. As a direct and proximate result of Defendant Finance of America's conduct, Plaintiff and Class Members have suffered and will continue to suffer various injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their PII is used; (3) the compromise, publication, and/or theft of their PII, including Social Security Numbers, addresses, names, date of birth, driver's license information, mortgage information, and financial account information; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Defendant's Data Breach.

160.    The benefits that Defendant Finance of America derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and data security practices alleged in this Complaint.

161.    Defendant Finance of America should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

### FOURTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### *(On Behalf of Plaintiff & the Class)*

162.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

163.    In light of the special relationship between Defendant Finance of America and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and Class Members' PII, Defendant became a fiduciary by their undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

164.    Defendant Finance of America has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with current and former and customers to keep secure their PII.

165.    Defendant Finance of America breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff and the Class in a reasonable and practicable period of time.

166.    Defendant Finance of America breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' PII.

167.    Defendant Finance of America breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify or warn Plaintiff and Class Members of the Data Breach.

168.    Defendant Finance of America breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII.

169.    As a direct and proximate result of Defendant Finance of America's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendant Finance of America's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class

Members; and (vii) the diminished value of Defendant Finance of America's services they received.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Melanie Place, on behalf of herself and all persons similarly situated, prays for judgment in her favor and against Defendant Finance of America Companies Inc., and respectfully requests that this Honorable Court enter an order:

A.  certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

B.  granting equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.  granting equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.  granting equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.  requiring Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F.  awarding actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.  awarding punitive damages, as allowable by law;

H.  Awarding attorneys' fees and costs under the common fund doctrine, and any other applicable law;

I.  awarding costs and any other expense, including expert witness fees, incurred by Plaintiff in connection with this action;

J.  Awarding pre- and post-judgment interest on any amounts awarded; and

K.  All such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: March 27, 2026                    Respectfully submitted,


By: */s/Leanna Loginov*
Leanna A. Loginov
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Telephone: (305) 479-2299
lloginov@shamisgentile.com


Britany A. Wessan*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
T: (708) 529-5418
britany@almeidalawgroup.com
*Attorneys for Plaintiff & the Putative Class*

*\*Pro hac vice application forthcoming*